**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**

**WENDY LEE RAGAN**                                                                                    **PLAINTIFF**

**versus**                                              **CIVIL ACTION NO. 3:11-cv-00679-TSL-MTP**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security**                                                                **DEFENDANT**

## REPORT AND RECOMMENDATION

Plaintiff Wendy Lee Ragan brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner denying her claim for a period of disability, disability insurance benefits, and supplemental security income. The matter is now before the court on the Defendant's Motion to Affirm the Commissioner's Decision [9] and on Plaintiff's Motion for Judgment on the Pleadings [7]. Having considered the pleadings, the transcript of the record, and the applicable law, and being thus fully advised in the premises, the undersigned recommends that the Commissioner's decision be AFFIRMED.

Ragan applied for disability, disability insurance benefits, and supplemental security income ("SSI") under the Social Security Act on April 22, 2009, alleging a "disabling condition," anxiety with frequent panic attacks and major depressive disorder, with an alleged onset date of April 1, 2009.[1] ([6-5] at 2-16; Memo. [8] at 3).[2] Ragan's applications were denied

---

[1] In the transcript of the hearing held before Administrative Law Judge Kingsley, Ragan testified that her anxiety became so severe beginning April 1, 2009, that she could no longer work. ([6-2] at 39). When asked what changed her condition, Ragan responded that trying to deal with the public was the main factor. *Id.* Although she stated that she had dealt with anxiety for a long time, Ragan said her condition worsened on April 1, 2009, to the point where she couldn't drive herself to work, couldn't perform work tasks, and cried every day at work. *Id.*

[2] For ease of reference, the record is cited to herein by the document and page number assigned by this court's Electronic Document Filing System.

initially on June 12, 2009, and on reconsideration on August 12, 2009. ([6-4] at 2-17; [6-3] at 2-5).

Ragan requested a hearing and on October 8, 2010, the hearing was convened before Administrative Law Judge ("ALJ") Robert Kingsley. ([6-2] at 37-81; [6-4] at 18-36). On February 7, 2011, ALJ Kingsley rendered his decision that Ragan was not disabled within the meaning of the Social Security Act from the alleged onset date, April 1, 2009, through the date of his decision. ([6-2] at 22-36). Ragan requested review of the hearing on February 28, 2011. ([6-2] at 6). The Appeals Council found no basis for changing the ALJ's decision, and on September 6, 2011, denied Ragan's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. ([6-2] at 2-4).

Aggrieved by the Commissioner's decision to deny benefits, Ragan filed a complaint in this court on November 2, 2011, seeking an order reversing the Commissioner's final decision and awarding her benefits or other such relief or judgment that this court deems equitable. Complaint [1]. The Commissioner answered [5] the complaint denying that Ragan is entitled to any relief. The parties have filed dispositive motions pursuant to the court's scheduling Order [3], and the matter is now ripe for decision.

APPLICABLE LEGAL STANDARDS

**Standard of Review**

This court's review of the Commissioner's decision is limited to inquiry into whether there is substantial evidence to support the Commissioner's findings and whether the correct legal standards were applied in evaluating the evidence. *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is "more than a scintilla, less than a preponderance, and is

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler,* 707 F.2d 162, 164 (5th Cir. 1983). To be substantial, the evidence "must do more than create a suspicion of the existence of the fact to be established." *Hames,* 707 F.2d at 164 (citations omitted). However, "[a] finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision." *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (internal citations and quotations omitted). Conflicts in the evidence are for the Commissioner, not the courts, to resolve. *Selders v. Sullivan,* 914 F.2d 614, 617 (5th Cir. 1990). A court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's, "even if the evidence preponderates against" the Commissioner's decision. *Harrell*, 862 F.2d at 475. If the decision is supported by substantial evidence, it is conclusive and must be affirmed. *Selders,* 914 F.2d at 617. Moreover, "'[p]rocedural perfection in administrative proceedings is not required' as long as 'the substantial rights of a party have not been affected.'" *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988)).

**<u>Burden of Proof</u>**

In *Harrell v. Bowen,* 862 F.2d 471, 475 (5th Cir. 1988), the Fifth Circuit detailed the shifting burden of proof that applies to the disability determination:

> An individual applying for disability and SSI benefits bears the initial burden of proving that he is disabled for purposes of the Social Security Act. Once the claimant satisfies his initial burden, the [Commissioner] then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and therefore, not disabled. In determining whether or not a claimant is capable of performing substantial gainful activity, the [Commissioner] utilizes a five-step sequential procedure set forth in 20 C.F.R. § 404.1520(b)-(f) (1988):
>
> > 1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

3

> 2. An individual who does not have a 'severe impairment' will not be found to be disabled.
> 3. An individual who meets or equals a listed impairment in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.
> 4. If an individual is capable of performing the work he has done in the past, a finding of 'not disabled' must be made.
> 5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

(citations and footnotes omitted). A finding that a claimant "is disabled or not disabled at any point in the five-step process is conclusive and terminates the . . . analysis." *Harrell*, 862 F.2d at 475.

## DISCUSSION

### **Medical/Factual History**

Ragan was forty-one years old at the time of the hearing and had a tenth grade education. ([6-2] at 48; 58). Her work history over the past fifteen years includes employment with gas marts and convenience stores as a cashier and working as a waitress at Waffle House. ([6-2] at 57; [6-6] at 16). Ragan last worked for Waffle House, but she testified that she has been unemployed since June of 2009 due to her anxiety and mental health issues. ([6-2] at 39, 57).

Ragan has been a patient with Region 8 Mental Health Services ("Region 8") since 2004. ([6-2] at 50). During 2007, Ragan visited Region 8 several times, seeing either Paul S. McGinnis, MD, a psychiatrist, or William Johnson, Staff Nurse Practitioner, for depression, anxiety, mood swings, and trouble sleeping. ([6-7] at 20-24). She was prescribed Prozac on January 17, 2007, to help with her biggest problem, anxiety. ([6-7] at 23-24). She was already taking Seroquel, an antidepressant, and Klonopin, an anxiety medication. She continued taking

4

these medications throughout 2007, and she was also prescribed Lithium on October 17, 2007, to regulate what Ragan described as "severe mood instability." ([6-7] at 21). On December 12, 2007, Ragan's Lithium dosage was increased from 300 mg to 900 mg per day. ([6-7] at 20). Throughout the year, Johnson's reports indicated that he believed Ragan was doing "okay" or "fairly well." ([6-7] at 23; 21). At her December 2007 visit, Region 8 reports indicate that Ragan was "doing better," that her moods had "definitely settled down some," and that her anxiety issues looked better. ([6-7] at 20).

By 2008, Region 8 reports show that Ragan, on her own, decided to stop taking Lithium and Prozac. ([6-7] at 17). On February 20, 2008, Ragan was prescribed Cymbalta, an antidepressant, because Ragan's anxiety and depression had worsened. Ragan continued taking Cymbalta, Seroquel, and Klonopin through her October 29, 2008 appointment. Between February and October of 2008, reports indicate that Ragan was doing "fairly well" and, although she still complained of depression, was showing signs of improvement. ([6-7] at 13-17). In the report from October 29, 2008, Johnson indicated that Ragan's continued symptoms of depression, anxiety, and sleep issues were, in his opinion, due to Ragan's noncompliance. Johnson noted that there was at least one month where Ragan was not taking her prescribed medicine. Johnson added Ragan on a low dose of Abilify to help with depression, Ragan's main complaint during the October visit. ([6-7] at 13-14).

On Ragan's April 15, 2009 visit to Region 8, Johnson and the treating nurse, Donna Allen, both noted that Ragan was severely depressed and Allen noted suicidal thoughts. Johnson decided to increase Ragan's prescribed dosage of Abilify, discontinue Cymbalta and Klonopin, and give her two new antidepressants, Pristiq and Valium. To help with Ragan's sleep issues,

5

Johnson also prescribed Sinequan. ([6-7] at 11-12).

On May 7, 2009, Ragan was taken to the emergency room at St. Dominic - Jackson Memorial Hospital ("St. Dominic") for suicidal thoughts and panic attacks. ([6-7] at 25-50). St. Dominic physicians originally thought that Ragan's suicidal thoughts were imminent, but Ragan later told the physicians that these thoughts had occurred two weeks prior to her emergency room visit. ([6-7] at 50). While in the hospital, Ragan was diagnosed with major depression without psychosis and tested positive for a urinary tract infection. ([6-7] at 32). Ragan's Discharge Summary shows that she was admitted to the hospital after becoming terribly sad, underactive, and withdrawn, but that she was much better on May 9, 2009, the date of discharge. *Id.* The Discharge Summary shows that Ragan requested to go home, was greatly improved, and was no longer having suicidal thoughts. *Id.* Ragan's discharge medications included Eskalith to regulate her moods, Celexa, an antidepressant, Remeron, and Klonopin. *Id.* On a follow-up visit with Ragan a few weeks after her discharge from St. Dominic, Johnson noted that he did not believe Ragan's inpatient stay did much to improve her condition. ([6-7] at 96).

Ragan's Region 8 reports from August through November 2009 indicated slight signs of improvement. ([6-7] at 93-95). Johnson mentions in his August report that Ragan had severe anxiety and panic attacks to the point that he doubted her ability to maintain employment, but he commented that he believed some of the medications were helping. ([6-7] at 95). Ragan's sister attended Ragan's October appointment with her and told Johnson that Ragan's anxiety had greatly improved. ([6-7] at 94). Although Ragan continued to battle depression, she denied that she was having any suicidal thoughts. *Id.* By her November appointment, Johnson said that Ragan was doing pretty well, appeared to be stable, and showed signs of slight improvement.

6

([6-7] at 93).

Between 2009 - 2010, Ragan's treating physician, Dr. Guess at Family Health Clinic in Pelahatchie, Mississippi, was also monitoring her condition and treating her for anxiety, depression, and sleeplessness.[3] ([6-7] at 104-17).

On May 12, 2009, Wilma Jenkins, Ragan's Case Manager at Region 8, completed the Medical Source Statement sent to her by the Office of Disability Determination Services ("DDS"). Jenkins rated as "Poor" all of the categories presented,[4] including Ragan's ability to follow rules, relate to co-workers, function independently, behave in an emotionally stable manner, and carry out even simple job instructions. ([6-7] at 58-60).

State Examiner Amy M. Baskin,[5] Ph.D, in her initial determination, and State Examiner

---

[3] In fact, Ragan made appointments with Dr. Guess for a myriad of reasons. On December 3, 2009, Ragan complained of dizziness, high blood pressure, and swelling of the throat. ([6-7] at 117). On her December 28, 2009 visit, Ragan's symptoms included acid reflux, pain in jaw, right earache, headache, and pain in the left arm. ([6-7] at 115). On December 13, 2010, Ragan complained of an abscess tooth. ([6-7] at 110). Ragan made an appointment on August 19, 2010, to seek treatment for back pain, stomach pain, and for swelling in both feet. ([6-7] at 106). On October 20, 2010, Ragan had general abdominal pain, and Dr. Guess recommended she go to the Emergency Room as his office did not have the necessary equipment. ([6-7] at 104). Finally, medical records show that on October 28, 2010, Ragan was referred to Dr. Andrew Smith, M.D. Ph.D, who determined that Ragan had no abdominal mass or abdominal wall hernia. ([6-7] at 101).

[4] Jenkins rated Ragan as "Poor" for every category included in the statement. The rating scale included, from highest to lowest, the following options: Unlimited, Good, Fair, and Poor. The categories included ability to: follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently, maintain attention/concentration, maintain personal appearance, behave in an emotionally stable manner, relate predictable in social situations, and demonstrate reliability. She also rated as "Poor" Ragan's ability to understand, remember, and carry out: complex job instructions; detailed, but not complex job instructions; and simple job instructions. ([6-7] at 59).

[5] In her Brief, Ragan refers to the State Agency physician as Amy M. Baskin. Memo. [8] at 6. Likewise, in the Disability Determination and Transmittal ([6-3] at 3), Dr. Baskin lists her name as "Amy M. Baskin." However, on the Functional Capacity Assessment, ([6-7] at 77), her

Carol Kossman, M.D., in her reconsideration determination, gave Ragan a primary diagnosis of organic mental disorders and a secondary diagnosis of schizophrenic, paranoid, and other functional psychotic disorders. ([6-3] at 3-4). On June 12, 2009, Dr. Baskin completed a Psychiatric Review Technique and Residual Functional Capacity ("RFC") Assessment. ([6-7] at 61-78). The Psychiatric Review Technique[6] indicated that Ragan had affective disorders such as depression, anxiety, and suicidal thoughts. *Id.* at 61-74. The RFC Assessment indicated that Ragan was moderately limited in her ability to understand, remember, and carry out detailed instructions and interact appropriately with the general public. However, Dr. Baskin noted that Ragan was not significantly limited in her ability to understand, remember, and carry out very simple instructions.[7] Dr. Baskin's conclusion was that Ragan appeared capable of understanding

---

name is printed as "Amy Morgan," possibly her maiden name. To avoid confusion, Dr. Amy M. Baskin, also known as Amy Morgan, is referred to herein as Dr. Baskin.

[6]Dr. Baskin listed Ragan's Functional Limitations as follows: mild restriction of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation over an extended duration. ([6-7] at 71).

[7]On the Summary Conclusions of Ragan's RFC Assessment, Dr. Baskin ranked Ragan as "Not Significantly Limited" in Ragan's ability to: remember locations and work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances; sustain an ordinary routine without supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and the ability to set realistic goals or make plans independently of others. Dr. Baskin ranked as "Moderately Limited" Ragan's ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism

and remembering simple instructions and completing those tasks, maintaining attention adequately for two-hour intervals in an eight-hour workday, interacting with supervisors and coworkers at a basic level, and adapting to a job setting. *Id*. at 75-77.

Ragan testified during the hearing before the ALJ that since June of 2009, her daily routine has consisted of taking her daughter to school and then siting in a dark room for the rest of the day. ([6-2] at 54). She does not cook and helps little with household chores. ([6-2] at 55). She continues to go to Region 8 once a month where she meets with Johnson, nurse practitioner, and she is visited at her home by Wilma Jenkins, case manager, who makes sure that she is taking her medicine as prescribed. *Id.* In a letter dated August 18, 2010, Johnson stated that he did not believe that Ragan could hold gainful employment or work in any type of social setting due to the severity of her symptoms. ([6-7] at 82).

Ragan also testified at the hearing before the ALJ that she had seen Dr. Guess[8] for stomach and bladder issues and was taking medication for both. ([6-2] at 52). She also testified to taking a diuretic to help with fluid buildup around her ankles, Clonazepam for anxiety, Cymbalta for depression, and a sleeping pill, Remeron. ([6-2] at 53-54). When asked if the medications controlled her symptoms, Ragan answered that, if taken as prescribed, these medications make her feel more stable. ([6-2] at 54).

**The Administrative Law Judge's Analysis**

As stated above, Ragan appeared for a hearing before ALJ Kingsley on October 8, 2010.

---

from supervisors; and respond appropriately to changes in the work setting. ([6-7] at 75-76).

[8]Spelled "Gest" phonetically in the hearing transcript. ([6-2] at 44).

The ALJ heard testimony from Ragan, who appeared *pro se*,[9] Patra Easterling, Ragan's sister, Whitney Skye Ragan, Ragan's daughter, and Daniel Myers, a vocational expert ("VE"). ([6-2] at 37-81). After considering the testimony and the evidence, the ALJ issued a decision finding that Ragan was not disabled. ([6-2] at 22-36). As an initial matter, the ALJ found that Ragan met the insured status requirements of the Social Security Act through December 31, 2013. At step one of the five-step evaluation process,[10] the ALJ found that Ragan had not engaged in any substantial gainful activity since April 1, 2009, the alleged onset date. At step two, he found that Ragan suffers from the following severe impairments: affective disorder and anxiety disorder.[11] ([6-2] at 27).

At step three, the ALJ determined that Ragan does not have an impairment, or combination of impairments, that meets or medically equals one of the listed impairments in 20 C.F.R. § 404, subpart P, Appendix 1. ([6-2] at 27). Next, the ALJ assessed Ragan's RFC,[12] and found that she retained the capacity to perform a full range of work at all exertional limitations, with the following non-exertional limitations: she is limited to simple, routine, repetitive tasks and can have only limited contact with supervisors, co-workers, and the general public. ([6-2] at

---

[9]Ragan appeared without a representative at the hearing. The ALJ advised Ragan of her right to a representative (attorney or non-attorney) and gave her the option of retaining a representative and postponing the hearing. Ragan chose to waive her right to representation and go forward with the hearing. ([6-2] at 39-42; [6-4] at 43).

[10]The ALJ applied the five-step evaluation process set forth in 20 C.F.R. § 404.1520(a) and § 416.920(a). ([6-2] at 25-32).

[11]*See* 20 C.F.R. §§ 404.1520(c) and 416.920(c) (2012).

[12]"Residual functional capacity" is defined in the Regulations as the most an individual can still do despite the physical and/or mental limitations that affect what the individual can do in a work setting. 20 C.F.R. § 416.945 (2012).

29). In making this determination, the ALJ considered Ragan's symptoms and the extent to which they can be reasonably accepted as consistent with the objective medical evidence and other evidence,[13] and also considered the opinion evidence.[14] *Id.*

At step four, the ALJ found that Ragan has no past relevant work.[15] Finally, at step five, the ALJ concluded that Ragan could perform a significant number of jobs in the national economy. The ALJ based this conclusion on Ragan's age, educational background, work experience, RFC, and the VE's testimony. ([6-2] at 31). These jobs included kitchen helper, hand packager, and washer. ([6-2] at 32). Accordingly, the ALJ found that Ragan was not disabled. *Id.*

## THE ISSUES

**I.     Whether the ALJ erred in finding that Ragan has the RFC to perform the basic mental demands of unskilled work.**

Ragan claims that the ALJ erred in his assessment of her RFC. Specifically, Ragan argues that the ALJ erred in finding that her RFC contained no exertional limitation. According to Ragan, the ALJ's determination could include jobs that require heavy lifting or the ability to carry up to 100 pounds occasionally within a work day, even though Ragan's work history as a

---

[13]*See* 20 C.F.R. § 404.1529 and § 416.929; SSR 96-4p, 1996 WL 374187 (S.S.A. July 2, 1996); 96-7p, 1996 WL 374186 (S.S.A. July 2, 1996).

[14]*See* 20 C.F.R. § 404.1527 and § 416.927; SSR 96-2p, 1996 WL 374188 (S.S.A. July 2, 1996); 96-5p, 1996 WL 374183 (S.S.A. July 2, 1996); 96-6p, 1996 WL 374180 (S.S.A. July 2, 1996); and 06-3p,71 FR 45593-03 (S.S.A. Aug. 9, 2006).

[15]The VE identified Ragan's past work as a cashier and waitress, but the earnings record showed that these jobs were not performed at the substantial gainful activity level and, therefore, cannot be considered vocationally relevant. *See* 20 C.F.R. § 404.1565 and § 416.965 (2012).

cashier and waitress are at the light exertional level.[16] Memo. [8] at 11. Ragan claims that because she has never worked at jobs with an exertional level above light, the ALJ's assessment of her exertional ability is "purely conjectural, and unsupported by substantial evidence of record." *Id*. at 3.

In her rebuttal, Ragan cites 20 C.F.R. § 404.1545(a)(3) which states that the RFC will be determined by "all the relevant medical and other evidence." Ragan claims that, according to these Regulations, assessment of the RFC must be grounded in evidence of the record and not mere speculation. *See* Rebuttal [11] at 6. Because Ragan has never worked at an exertional level that required heavy lifting, she asserts that a determination that she could do such lifting would be outside of the record and purely conjectural. *Id.*

"When there is no allegation of physical . . . limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). RFC is an assessment of the most an individual can do despite the limitations that stem from her medically determinable impairments, including those that are not severe. *Acosta v. Astrue*, --- F. Supp. 2d ----, 2012 WL 1994985, at *17 (W.D. Tex. Mar. 2, 2012) (citing SSR 96-8p, 1996 WL 374184, at *2, *5).

Although Ragan asserts that the ALJ should have only considered evidence within the

---

[16]Ragan contends that her prior jobs as a waitress and cashier were classified at the light exertional level and required "Occasional" lifting and carrying up to twenty pounds with "Frequent" lifting of ten pounds. She states that "Occasional" lifting is defined as twenty minutes per hour and "Frequent" lifting is considered forty minutes per hour. Memo. [8] at 11.

record when making his RFC determination, Ragan points to no evidence in the record that demonstrates an inability to perform heavy lifting. She did indicate at her hearing that she is on medication for a stomach problem, bladder issues, and fluid buildup on her ankles. ([6-2] at 52). However, none of these are mentioned as contributing factors to her April 1, 2009 disability.[17] It appears the ALJ fully considered the evidence in the record in making his determination, and on review of the record, the court finds that substantial evidence supports his RFC assessment that Ragan could perform work at any exertional level.

Ragan also asserts that the nonexertional limitations in the RFC assessment contradict the mental requirements for the performance of unskilled work. Memo. [8] at 11. Ragan claims that the ALJ's assessment has limited her to unskilled work which requires mental abilities such as understanding, remembering and carrying out short and simple instructions; working in coordination with or in proximity to others without being distracted; and completing an ordinary workday without interruptions from psychologically based symptoms, to name a few. Rebuttal [11] at 4.

Ragan is correct that the basic mental demands of competitive, unskilled work do include the abilities "to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 904-05 (5th Cir. 2010). The ALJ must not assume that failure to meet or equal a listed mental impairment means that one has the capacity to do unskilled work. *Id.* at 904. The ALJ must consider relevant

---

[17]When asked what condition prevented her ability to work, Ragan answered that it was her anxiety. ([6-2] at 49).

13

evidence regarding mental impairments. *Id.* (stating that the ALJ properly considered claimant's mental impairments in determining RFC by referencing findings from mental status evaluation, treatment records, and hearing testimony; determining limitations; and incorporating limitations into his RFC determination).

Here, the ALJ considered Ragan's mental impairments but was not convinced that the claimant's statements concerning the intensity and limiting effects of her symptoms were fully credible, and he concluded that she had the RFC to perform unskilled work. In making his determination, the ALJ mentioned factors such as Region 8 medical notes that indicate Ragan's condition had improved and that she had been noncompliant with her treatment. The ALJ also referenced Ragan's own testimony from the hearing that the medication works to stabilize her mood. ([6-2] at 30).

The ALJ further considered the state psychological consultant's report which indicated that the claimant had mild limitations in performing activities of daily living; moderate limitations in maintaining social functioning; moderate limitations in maintaining concentration, persistence and pace; and no episodes of decompensation. *Id.* He found that it was supported by the record and afforded it significant weight. *Id.*

The ALJ incorporated these factors into his RFC determination. It appears the ALJ fully considered the evidence in the record in making his determination, and on review of the record, substantial evidence supports his conclusions.

**II. Whether the ALJ erred in failing to give adequate weight to the opinions of Ragan's treating physicians[18]**

Ragan alleges the ALJ erred in failing to give adequate weight to her "treating physicians'" opinions by failing to address the factors listed in 20 C.F.R. §§ 404.1527(c), 416.927(c).[19] Ragan references the Region 8 Medical Source Statement ("MSS") dated May 12, 2009, which rated all of her abilities as "Poor," including her ability to relate to co-workers, carry out simple job instructions, function independently, and interact with supervisors. ([6-7] at 58-60). This MSS was completed and signed by Wilma Jenkins, Ragan's Case Manager at Region 8, who is not a medical doctor. *Id.*

Ragan also references a letter dated August 18, 2010, from William Johnson, nurse

---

[18]Under the Issue II heading, Ragan also states that the ALJ erred in failing to contact Ragan's treating physicians to obtain updated opinions on the severity of Ragan's mental impairments. Memo. [8] at 1, 9. However, Ragan never discusses this in her Memorandum [8] or Rebuttal [11].

[19]The Regulations at 20 C.F.R. § 404.1527(c) and § 416.927(c) (2012) (formally subsection (d), as cited by Ragan) provide as follows:

> (c) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship. . . .
> (2) Treatment relationship. . . .
>   (i) Length of the treatment relationship and the frequency of examination...
>   (ii) Nature and extent of the treatment relationship. . . .
> (3) Supportability. . .
> (4) Consistency. . . .
> (5) Specialization. . . .
> (6) Other factors. When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. . . .

practitioner, stating he has seen Ragan almost monthly since September 2004, and did not believe she could hold gainful employment.[20] Memo. [8] at 12; ([6-7] at 82). Ragan contends that the ALJ erred when he assigned "no weight" to the MSS and the letter from Johnson, but assigned "significant weight" to Dr. Baskin's evaluations.[21]

In his decision, the ALJ mentioned that he did evaluate the two opinions from Jenkins and Johnson. ([6-2] at 30). Contrary to Ragan's argument, the ALJ did evaluate the factors set forth in 20 C.F.R. § 404.1527(c) and § 416.927(c).[22] In deciding whether to afford weight to these opinions, the ALJ stated that he "considered the nature and extent of the relationship between the sources and the individual, the source qualifications, the source's area of specialty or expertise, [and] the degree to which the sources presented relevant evidence to support their opinions." The ALJ determined that "[n]either individual is a medical source in accordance with SSR 06-03p" and assigned no weight to their opinions, reasoning that they were not supported by Ragan's medical records or the notes of any treating physician. ([6-2] at 30-31).

Ragan asserts that the ALJ erred because the SSA Regulations require more weight be

---

[20] In her Memorandum, Ragan indicates that Johnson's letter states an opinion on behalf of Region 8. Memo. [8] at 12. In his letter, however, Johnson does not state that he is expressing an opinion on behalf of Region 8 or Ragan's treating physician, Dr. McGinnis. ([6-7] at 82). Rather, Johnson expresses a personal opinion. In his letter, he writes, "I feel like hospitalization would be beneficial . . . I continue to feel like she could not hold gainful employment and can not work in any type of social setting due to the severity of her symptoms." *Id.*

[21] As previously mentioned, Dr. Baskin evaluated Ragan's records twice but never personally examined Ragan. *See* Disability Determination Transmittal ([6-3] at 3) and Functional Capacity Assessment ([6-7] at 77).

[22] *See supra*, footnote 19.

given to examining sources than to non-examining sources.[23] The Regulations provide that "Generally, [the Social Security Administration] give[s] more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]." 20 C.F.R. §§ 404.1527(c)(1) and 416.927(c)(1) (2012). Further, it is true that a treating sources's opinion on the nature and severity of a patient's impairment must be accorded controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (2012); *see also Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). An ALJ must show good cause for giving little or no weight to a treating source's opinion. *Newton* 209 F.3d at 455-56.

However, Wilma Jenkins, Ragan's case manager at Region 8, and William Johnson, a nurse practitioner, are not "acceptable medical sources," and "only 'acceptable medical sources' can be considered treating sources, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight." *See* 20 C.F.R. §§ 404.1513, 416.913 (2011) (listing acceptable medical sources as licensed physicians, psychologists, podiatrists, and speech-language pathologists); *Reynolds v. Astrue,* No. 1:08cv228–SAA, 2010 WL 583918, at *1 (N.D. Miss. Feb. 16, 2010) (noting that a nurse practitioner is considered an "other medical source" under 20 C.F.R. § 404.1513); *see also Crisman v. Astrue*, No. 2:09CV115–SAA, 2010 WL 2540602, at *6 (N.D. Miss. June 17, 2010); *Patrick v. Astrue*, No. 3:10cv371–DPJ–FKB, 2011 WL 3882818, at *3 (S.D. Miss. Aug. 15, 2011), report and recommendation adopted by opinion

---

[23]*See* Memo. [8] at 14 (citing 20 C.F.R. §§ 404.1527(c) and 416.927(c), formally subsection (d)).

dated Sept. 2, 2011, 2011 WL 3881492 (nurse practitioners are not acceptable medical sources); SSR 06-03P, 2006 WL 2329939, at *2 (S.S.A. Aug. 9, 2006) (stating that only "acceptable medical sources" can be considered treating sources whose medical opinions may be entitled to controlling weight as set forth in 20 CFR § 404.1527(c) and § 416.927(c)).

Further, the Fifth Circuit has recognized that the opinion of an "other medical source," even one who has treated the claimant on a regular basis, is not entitled to the same deference as an opinion provided by an "acceptable medical source." *Thibodeaux v. Astrue*, 324 F. App'x 440, 445 (5th Cir. 2009). "Only 'acceptable medical sources' can establish the existence of a medically determinable impairment, give medical opinions, and be considered treating sources whose medical opinions may be entitled to controlling weight." *Thibodeaux*, 324 F. App'x at 445.

While an ALJ may consider evidence from "other sources," such as Jenkins and Johnson, to show the severity of the claimant's impairment and how it affects her ability to function, here, ALJ Kingsley reasoned that he assigned their opinions no weight because they were "not supported by the claimant's medical records or by the treating notes of any physician who has followed claimant's mental state." ([6-2] at 31); *see also* SSR 06-03P, 2006 WL 2329939, at *2 (S.S.A. Aug. 9, 2006). "[T]he ALJ, and not this Court, must decide what weight to give the proffered medical evidence." *Luckey v. Astrue*, 458 F. App'x 322, 326 (5th Cir. 2011). Further, Johnson's opinion that Ragan is unable to work is an issue reserved for the Commissioner, and is not entitled to controlling weight. *See* SSR 96-6p, 1996 WL 374183 (S.S.A. July 2, 1996).

CONCLUSION/RECOMMENDATIONS

The undersigned finds that the Commissioner's decision that Ragan is not entitled to

disability benefits or SSI under the Social Security Act is supported by substantial evidence and utilizes correct legal standards. It is, therefore, the recommendation of the undersigned that the Commissioner's Motion to Affirm [9] be granted and the denial of benefits affirmed. The undersigned further recommends that Ragan's Motion for Judgment on the Pleadings [7] be denied.

## NOTICE OF RIGHT TO OBJECT

In accordance with the rules, any party within fourteen days after being served a copy of this recommendation, may serve and file written objections to the recommendations, with a copy to the judge, the magistrate judge and the opposing party. The District Judge at the time may accept, reject or modify in whole or part, the recommendations of the Magistrate Judge, or may receive further evidence or recommit the matter to this court with instructions. The parties are hereby notified that failure to file written objections to the proposed findings, conclusions, and recommendations contained within this report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions accepted by the district court to which the party has not objected. *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1428-29 (5th Cir. 1996).

THIS the 16th day of August, 2012.

                                                s/ Michael T. Parker
                                                United States Magistrate Judge